UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION No. 20-12050-RGS

BAY PROMO, LLC

v.

ARELY NICOLLE MONCADA ALANIZ

FINDINGS OF FACT, RULINGS OF LAW,
AND ORDER AFTER A BENCH TRIAL

November 27, 2023

STEARNS, D.J.,

Bay Promo sued Arely Nicolle Moncada Alaniz, a former contract employee, in the Eastern District of New York in September of 2020, alleging claims of breach of contract, unjust enrichment, violations of Florida's anti-surveillance statute, Fla. Stat. § 934.10, and misappropriation of trade secrets. Bay Promo subsequently moved for a change of venue, and the case was transferred to this district in November of 2020. In her answer to the Complaint, Moncada asserted four counterclaims: breach of contract, violation of Fla. Stat. § 686.201, quantum meruit, and unjust enrichment.[1] After Bay Promo made several dishonest representations to the court

---

[1] Fla. Stat. § 686.201 was repealed well before Moncada asserted her counterclaims, so the court dismissed this Count on agreement by the parties. *See* Dkt. # 38.

regarding the health of one of its principals – including filing a forged doctor's note – the court convened a show cause hearing to permit Bay Promo to explain why sanctions should not be imposed.  Bay Promo's attorney attended the hearing without live or remote witnesses.  After hearing the parties' arguments, the court dismissed Bay Promo's affirmative claims with prejudice.  Dkt. # 84.

A two-day bench trial was convened on July 31-August 1, 2023, to hear Moncada's counterclaims.  The single issue at trial was whether Bay Promo owed Moncada commissions for sales and attempted sales of personal protective equipment (PPE) on behalf of Bay Promo in March and April of 2020.  Based on the credible testimony and exhibits offered at trial, the court makes the following findings and rulings.

## FINDINGS OF FACT

### *The Parties*

    1.    Plaintiff Arely Nicolle Moncada Alaniz is a resident of Massachusetts.

    2.    Defendant Bay Promo, LLC, is a Florida limited liability company with a principal place of business in Tampa, Florida.  Humberto Arguello, Jr. and Thisal Jayasuriya are the principals of Bay Promo.

***Moncada's Employment***

3.  On March 23, 2020, Arguello recruited Moncada as a "sales distribut[ion] officer" (effectively an account representative) who would "provide to [Bay Promo] duties as needed" for a term of one month. Ex. 10 ¶¶ 1, 10; Day 2 Tr. at 80. Moncada at the time was an undergraduate student at Emerson College who was acquainted with Arguello through family connections in her native Nicaragua. As defined in her contract, Moncada agreed to perform "duties as are customarily performed by an employee in a similar position," and "other and unrelated services and duties as may be assigned to [her] from time to time." Ex. 10 ¶ 2. Moncada was not, however, authorized to "enter into any contracts or commitments for or on behalf of [Bay Promo] without first obtaining the express written consent of [Bay Promo]." *Id.* ¶ 9. The parties memorialized Moncada's employment in a written commission agreement (Commission Agreement) effective on March 21, 2020.

4.  Under the Commission Agreement, Bay Promo promised to pay Moncada a commission "based on 6% of gross sales of [$]3,640,000.00 USD . . . at the conclu[s]ion of each project."[2] *Id.* ¶ 3. As for subsequent

---

[2] Although it is not clear from the language of the Commission Agreement that the contemplated "project" related solely to the purchase of protective masks from Denim & More, PC, for sale to New York City (as

3

projects, the Agreement stated that the "commission rate will be determined by Humberto Arguello CEO [on a] project by project basis." *Id.* The Commission Agreement did not define "project."

5. Moncada did not price sales items or draft purchase orders or invoices; instead, when she received a purchase order from a client, she would forward the order to Arguello and/or Margina Arguello (Humberto's mother), who would draft the invoice. Day 1 Tr. at 83, 86-87.

6. Moncada was never formally terminated. However, she lost access to Bay Promo's "portal" some three weeks after entering the Commission Agreement, on or about April 12, 2020, and she lost access to her Bay Promo email on or about April 15, 2020. *Id.* at 120.

***The New York Order***

7. In March of 2020, Lee Parrish and his son started a company, Denim & More, PC, to fabricate t-shirts and denim products. Day 1 Tr. at 18. Soon after the Parrishes formed the company, a friend of New York Senator Chuck Schumer contacted Lee Parrish to ask whether Denim & More was able to supply protective face masks to New York City. *Id.* at 19. Parrish

---

discussed below), the parties agree that the contractual reference was to that sale alone.

4

reached out to a business friend, Scott Vaughn, and on March 21, 2020, Vaughn introduced Parrish to Moncada via email. *Id.* at 24; Ex. 2 at 11-12.

8.   After an initial discussion, Parrish emailed Moncada to order "500,000 units per week of the KN95 and surgical masks [at a] $1.40 and [$0].34 price commitment" (New York Order). Ex. 2 at 9. Parrish sent Moncada a draft purchase order on behalf of Denim & More that stipulated that Bay Promo would deliver to New York lots of 500,000 FDA-approved KN95 masks and 500,000 FDA-approved surgical face masks on April 1, April 8, April 15, and April 22, 2020. *Id.* at 54-55. The total price for the purchase order was $3.48 million. *Id.*

9.   While Parrish and Moncada were finalizing the terms of the New York Order, Parrish asked Moncada to forward to him the FDA certification approvals for the factories at which the masks were being manufactured. *Id.* at 13. Many customers, including New York City, required factories to be FDA certified before placing orders. Day 1 Tr. at 31; *see also* Day 2 Tr. at 30. Moncada sent Parrish the FDA certifications the same day. *See* Ex. 3. The certifications she provided were for Shanghai Dasheng Health Products Manufacture Co., Ltd.; Xiantao Sanda Industrial Co., Ltd.; San Huei United Company Ltd.; Hangzhou Clongene Biotech Co., Ltd.; and Xianoheng

5

Zooboo Sports Goods Co., Ltd. (all Chinese companies).[3] *Id*. Parrish also required that the contract state that Bay Promo would "be responsible for the delivery on time with payment." Ex. 2 at 48.

10.  On March 22, Moncada sent Parrish a contract and revised purchase order on behalf of Bay Promo. *Id.* at 68-74. The contract stated that Denim & More would pay "50% of the invoice . . . before the production starts," and the remaining 50% "before delivery." *Id.* at 68.

11.  Moncada sent Parrish a final contract and purchase order the same day. *Id.* at 79-86. Before the parties signed the contract and purchase order, the price per mask increased by 4 cents, bringing the final cost of the order to $3.64 million. Parrish signed the contract the same day, *id.* at 93, and Denim & More wired the 50% deposit to Bay Promo on March 24, 2020, Ex. 4.

12.  Bay Promo did not timely deliver the New York Order; the first delivery arrived several weeks late. Day 1 Tr. at 39; Day 2 Tr. at 31. When the masks were finally delivered, New York City rejected them because they had not originated from any of the factories for which Bay Promo had

---

[3] In addition to these certifications, on March 29, Arguello sent Parrish a letter that stated that Bay Promo guaranteed "as an FDA Approved Initial Importer, that all respirators are manufacturer [*sic*] by Xiantao Sanda Industrail [*sic*] under FDA Registration NO. 3008048818." Ex. 2 at 208.

provided FDA certifications. Day 1 Tr. at 39-40, 55; Day 2 Tr. at 33. Believing that Denim & More had breached its contract, New York City refused to pay Denim & More the outstanding balance on the order and then sued Denim & More for a refund of the deposit. *Id.* at 37; Day 2 Tr. at 38. Denim & More in turn refused to make any further payments to Bay Promo. *See* Day 1 Tr. at 37.

### *The Contour Order*

13. While putting the finishing touches on the New York Order, on March 23, 2020, Parrish forwarded an email to Arguello and Moncada from a potential purchaser of KN95 and surgical masks in Kansas City (Contour Order). *See* Ex. 2 at 113.

14. Arguello sent Parrish a draft invoice for the Contour Order on March 24 and copied Moncada – whom he identified as the "account rep" – on the email. *Id.* at 131. Parrish responded by modifying the quantity of the order, causing Arguello to send a revised invoice reflecting the modifications, which Parrish accepted. *Id.* at 154. In sending the revised invoice, Arguello did not copy Moncada. *Id.*

15. On March 27, Parrish's assistant sent Moncada and Arguello a second purchase order from Kansas City. *Id.* at 183. Moncada asked Margina Arguello to add this additional order to the original Contour Order.

7

*Id.* at 184.  Margina Arguello sent a revised invoice to Parrish for $503,960, which listed Moncada and Arguello as the salespeople.  *Id.* at 187.  Parrish signed the invoice the same day.  *Id.* at 191.  Parrish paid Bay Promo for the Contour Order on May 6, 2020.  *See* Ex. 4 at 1, 4.

### *The Cravens Orders*

16.   In late March of 2020, Jeffrey Cravens, the owner of an apparel company called Cravens Group LLC, contacted Parrish to ask whether he had access to any PPE suppliers.  Ex. 9 at 7.  Parrish recommended Bay Promo.

17.   Cravens submitted his first order to Bay Promo through Parrish on March 26, 2020 (Wells Fargo Order).  *Id.* at 8; Ex. 2 at 201.  Moncada sent Parrish an invoice for $370,500 for the Wells Fargo Order on March 28, 2020.  Ex. 2 at 202; Ex. 5 at 15.

18.   Cravens submitted seven additional orders to Bay Promo: one on April 2 for $362,000;[4] one on April 13 for $230,050; two on April 14 for $430,000 and $5,101,200, respectively; one on April 16 for $1.92 million; one on April 23 for $720,000; and one on May 8 for $1,291,680.  Ex. 5 at 12,

---

[4] The invoice for the April 2 order was not entered into evidence, ostensibly because Bay Promo denied doing any business with Cravens and refused to produce it.  There is other evidence, however, such as spreadsheets showing outstanding orders, that demonstrate the existence of the order. *See, e.g.*, Ex. 5 at 12.

8

17-24. The record includes no communications from Cravens or Parrish to Moncada placing these orders.

***Moncada's Commission Payments***

19.   Moncada spoke with Arguello on March 24 about receiving a commission for the Contour Order, and he directed her to Jayasuriya. Day 1 Tr. at 88, 90-91. That evening, Moncada emailed Arguello stating that she intended to instruct Jayasuriya to draft a commission agreement with her for the Contour Order, which would include a commission of 6% of the total price of the order "to be paid at the conclu[s]ion of [the] project."[5] *See* Ex. 12; Day 1 Tr. at 88. Arguello did not respond to this email. Ex. 12. Moncada then asked Jayasuriya to draft a commission agreement for the Contour Order. *See* Ex. 13 at 10. Jayasuriya did not respond to her message. *Id.*

---

[5] Many of the exhibits entered at trial, including Exhibit 12, are in Spanish and were admitted without certified translations; instead, Moncada translated the documents on the stand. The court will accept Moncada's under-oath translations as being offered in good faith but will not endeavor to translate documents or credit portions of documents that were entered into evidence and not translated under oath. *E.g.*, *Echavarria v. Roach*, 565 F. Supp. 3d 51, 64 (D. Mass. 2021) (striking exhibits in Spanish without certified translations); *Rogondino v. Paolillo*, 808 F. Supp. 2d 386, 390 (D.P.R. 2011) (refusing to consider untranslated evidence). And the court notes, as it did at trial, that should either party appeal this order, the First Circuit "will not receive documents . . . not in the English language unless translations are furnished." 1st Cir. R. 30.0(e).

20. Moncada never received a commission agreement for the Contour Order. Day 1 Tr. at 93.

21. Beginning in April, Moncada proposed to Bay Promo that she would generate a commission for herself by marking up the cost per item of future orders by 6%. Day 1 Tr. at 102.

22. There is no credible evidence that Arguello and Moncada discussed paying Moncada this 6% commission, through a pricing markup or otherwise, for the Wells Fargo and April 2 Orders.[6]

23. Although Moncada testified that she "ha[d] an agreement with Humberto about the commissions for [the April 13] deal," *id.* at 111, there is no evidence other than her assertion to support the existence of such an agreement.

---

[6] Moncada testified that messages between her and Arguello on April 7 referenced markups of the Wells Fargo Order, which was placed on March 26, and the April 2 Order. Day 1 Tr. at 102-104. This testimony is not credible. In this April 7 message chain, Moncada and Arguello disagree about the price per item for an order that included gloves and two types of surgical gowns. *See* Ex. 16. But the invoice for the Wells Fargo Order shows that it was only for KN95 and surgical masks, *see* Ex. 5 at 15-16, and Cravens Group paid 50% of the cost of the order on March 27, *see* Ex. 22 at 4. Cravens Group paid 50% of the cost of the April 2 Order on April 2. *See* Ex. 22 at 16. It is inconceivable that Moncada and Arguello would be debating the price per item of orders that were consummated with a 50% deposit days or weeks prior. At any rate, her message does not mention that she will take a commission based on the markup, and Arguello did not approve the markup. Ex. 16; Day 1 Tr. at 101. Indeed, Arguello told her that the prices she planned to charge were not viable. *See* Ex. 16.

24. Moncada first messaged Arguello about receiving a 6% commission by marking up prices on April 3. *See* Ex. 20. The conversation related to the smaller April 14 order (Delta Order). Moncada and Arguello debated whether to quote items at $1.50 or $1.59 each, and Arguello explained that they would quote a price of $1.50 per mask because the buyer would absorb the shipping costs. *Id.* at 3. Moncada responded that "from the $1.50 the 6% is included. I will do it right now." *Id.* Arguello responded, "Yes. Send them the quote." *Id.*

25. Regarding the second April 14 order, Moncada messaged Margina Arguello on April 8 and April 14 to discuss how the price per item would reflect a 6% markup. Moncada testified that she was concerned because she did not want "to lose any money on these sales, since [she] already los[t] in the previous sale." Day 1 Tr. at 107. On April 8, Margina told Moncada that the price per item was $1.50, and Moncada repeatedly responded that the price should be $1.60. Ex. 17; Day 1 Tr. at 108. Margina told Moncada to call Arguello. Ex. 17; Day 1 Tr. at 108. On April 14, Margina messaged Moncada and told her the price per item would be $1.56, to which Moncada responded, "I told Tito that I will receive 6 percent." Ex. 20; Day 1 Tr. at 110.

26. The parties did not discuss commission payments for the April 16, April 23, and May 8 orders.

27. Bay Promo, through its principal Jayasuriya, paid Moncada approximately $41,000. Day 1 Tr. at 122. The payment was in part salary for her work as Arguello's assistant and in part an advance of the commission owed to her on the New York Order. Day 2 Tr. at 76. This $41,000 payment was the only payment she received from Bay Promo. Day 1 Tr. at 122.

## RULINGS OF LAW

1. The contract states that Florida law applies, and the parties agree that Florida law applies to both the contractual and quasi-contractual claims, so there is "no need to engage in further choice-of-law analysis." *Scottsdale Ins. Co. v. United Rentals (N. Am.), Inc.*, 152 F. Supp. 3d 15, 19 (D. Mass. 2015); *see also Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Flanders-Borden*, 11 F.4th 12, 20 (1st Cir. 2021).

2. The basic requirements of a valid contract under Florida law are offer, acceptance, consideration, and sufficient specification of the contract's essential terms. *St. Joe Corp. v. McIver*, 875 So. 2d 375, 381 (Fla. 2004). A contract is "premised on the parties' requisite willingness to contract." *Kolodziej v. Mason*, 774 F.3d 736, 741 (11th Cir. 2014). Oral contracts are

valid and enforceable under Florida law and entail the same elements. *St. Joe Corp.*, 875 So. 2d at 381.

3. Florida law recognizes two types of brokerage contracts for commission payments. In the first, the broker is entitled to a commission if she "produce[s] a purchaser ready, able and willing to perform upon the terms fixed, leaving to the seller the actual closing of the sale." *Knowles v. Henderson*, 156 Fla. 31, 34 (1945). In the second, the broker "is not entitled to [her] commissions until [s]he not only has found a purchaser who is ready, able and willing to buy upon the terms fixed by the seller but has also actually effected the sale or procured from the prospective purchaser a binding contract of purchase." *Id.* The type of brokerage contract at issue is determined by the language of the agreement. *See Wiggins v. Wilson*, 55 Fla. 346, 354 (1908).

4. To be entitled to a commission under the second type of brokerage contract, the broker must be the "procuring cause" of the sale, meaning "the broker must bring the parties together and cause the sale as a result of continuous negotiations [s]he instigated." *Warren Hunnicutt, Jr., Inc. v. Gleason*, 462 So. 2d 878, 879 (Fla. Dist. Ct. App. 1985); *see also Ehringer v. Brookfield & Assocs.*, 415 So. 2d 774, 775-776 (Fla. Dist. Ct. App. 1982) (the broker must initiate negotiations "by doing some affirmative act").

13

A broker usually must remain "involved in the continuing negotiations between the seller and the buyer" to be a procuring cause. *Rotemi Realty, Inc. v. Act Realty Co.*, 911 So. 2d 1181, 1189 (Fla. 2005), quoting *Siegel v. Landquest, Inc.*, 761 So. 2d 415, 417 (Fla. Dist. Ct. App. 2000). However, if, despite the broker's efforts to remain involved in the negotiations, "the seller and buyer exclude the broker from the negotiations," she may still be a procuring cause. *Id.*, quoting *Sheldon Greene & Assocs. v. Rosinda Invs., N.V.*, 475 So. 2d 925, 927 (Fla. Dist. Ct. App. 1985).

5.  Regardless of the type of brokerage contract, a broker is generally entitled to a commission even "if the customer remains ready, able and willing to purchase" but, "not for any fault of the broker or purchaser, . . . the seller will not or cannot complete the transaction." *Knowles*, 156 Fla. at 34. But a broker cannot recover a commission if the parties have reached a "specific agreement" that payment of a commission is contingent on the closing of the sale. *Hanover Realty Corp. v. Codomo*, 95 So. 2d 420, 423 (Fla. 1957).

6.  To prove a breach of contract, Moncada must show "(1) a valid contract; (2) a material breach; and (3) damages." *Rauch, Weaver, Norfleet, Kurtz & Co. v. AJP Pine Island Warehouses, Inc.*, 313 So. 3d 625, 630 (Fla. Dist. Ct. App. 2021).

7.  A party cannot recover in equity if an express contract "concern[ing] the same subject matter" exists at law. *F.H. Paschen, S.N. Nielsen & Assocs. v. B&B Site Develop., Inc.*, 311 So. 3d 39, 49 (Fla. Dist. Ct. App. 2021).

8.  To prevail on a quantum meruit claim, Moncada must prove that she "provided, and [Bay Promo] assented to and received, a benefit in the form of goods or services under circumstances where, in the ordinary course of common events, a reasonable person receiving such a benefit normally would expect to pay for it." *W.R. Townsend Contracting, Inc. v. Jensen Civil Constr., Inc.*, 728 So. 2d 297, 305 (Fla. Dist. Ct. App. 1999).

9.  The elements of an unjust enrichment claim are: "(1) the plaintiff has conferred a benefit on the defendant; (2) the defendant has knowledge of the benefit; (3) the defendant has accepted the benefit conferred; and (4) the circumstances are such that it would be inequitable for the defendant to retain the benefit without paying fair value for it." *F.H. Paschen, S.N.*, 311 So. 3d at 48.

**ULTIMATE FINDINGS OF FACT AND RULINGS OF LAW**

*Breach of Contract*

1.  Moncada entered a valid written contract with Bay Promo for the New York Order.

2. It is not clear from the Commission Agreement whether Moncada was required only to produce a purchaser or whether she was required to produce a purchaser and procure a binding purchase contract. But this distinction is irrelevant; Moncada produced a purchaser –Parrish – who was ready, able, and willing to perform and who signed a binding contract to purchase PPE from Bay Promo.  Moncada was the procuring cause of the sale because she brought Parrish and Bay Promo together through an affirmative act – connecting them via email – and was "involved in the continuing negotiations" between the parties. *See Rotemi*, 911 So. 2d at 1189, quoting *Siegel*, 761 So. 2d at 417; *Ehringer*, 415 So. 2d at 775-776 ("promoting calls from prospective buyers" is an affirmative act).  She was thus entitled to 6% of the price of the Order at the conclusion of the project. *See* Ex. 10 ¶ 3.

3. The fact that the New York Order was never completed because Denim & More did not pay the outstanding balance of the Order does not vitiate her right to a commission.  Denim & More remained willing and able to purchase the masks, but the Order was not completed because of Bay Promo's failure to perform.[7]  *See Knowles*, 156 Fla. at 34.  Every witness

---

[7] The court understands that Bay Promo and Denim & More are in separate litigation regarding whether either party breached their sales

familiar with the New York Order agreed that Bay Promo delivered the masks late and that the masks were manufactured by factories other than those for which Bay Promo had produced FDA certifications.[8]

4.   Bay Promo breached the Commission Agreement and must pay Moncada a 6% commission on the total price of the New York Order.  This amount will not be offset by the approximately $41,000 that Bay Promo already paid Moncada, as the court finds that this is sufficient compensation for the other work that Moncada performed for Bay Promo in her role as a de facto employee prior to her constructive termination in April of 2020.

5.   Although Moncada attempted to contract for commission payments for the non-New York orders (and at times insisted that she be paid), Arguello never agreed to pay her an additional commission as the terms of the Commission Agreement required.  (While with respect to the Delta Order, Arguello responded to Moncada's insistence on a 6% commission with a single text saying "[y]es," this noncommittal, ambiguous

---

contract with New York.  The court expresses no opinion on the merits of their dispute.

[8] Bay Promo introduced two documents at trial that it claimed were FDA certifications for Dong Yang Shi Qing Dou Home Articles Co., Ltd., the manufacturer of the masks that Bay Promo attempted to deliver to Denim & More.  *See* Exs. 24, 25.  But there is no credible evidence that they are authentic or were ever provided to Denim & More.

message falls far short of the essential terms required to create a binding contract.  *See St. Joe Corp.*, 875 So. 2d at 381.[9])

6. Because there was no meeting of the minds to pay Moncada a further commission, there was no express contract governing any order other than the New York Order.  *See Lyng v. Bugbee Distrib. Co.*, 133 Fla. 419, 420 (1938).

***Equitable Relief***

7. Moncada cannot recover in equity for the New York Order.  *See F.H. Paschen*, 311 So. 3d at 49.

8. Moncada's equitable claims for the sales after the New York Order fail because she did not prove that she was the cause of any benefit conferred on Bay Promo for any of these sales.  *See W.R. Townsend*, 728 So. 2d at 305; *F.H. Paschen*, 311 So. 3d at 48.

9. Regarding the Contour Order, while Parrish contacted both Arguello and Moncada to place the Order, Arguello did the work on the Order.  Moreover, the Contour Order was not a "project" for which Moncada

---

[9] Even if a contract existed for the Delta Order, it would not be a valid brokerage contract under Florida law because Parrish, not Moncada, brought Cravens to Bay Promo.  *See Knowles*, 156 Fla. at 34.  Moncada thus did not "produce a purchaser ready, able and willing to perform."  *See id.*

had been authorized to perform under the Commission Agreement. *See* Ex. 10.

10. Regarding the Cravens Orders, the evidence is clear that Parrish brought Cravens to Bay Promo, and thus Moncada did not confer any benefit on Bay Promo. *Cf. Fred McGilvray, Inc. v. Delphian Grp.*, 424 So. 2d 891, 892 (Fla. Dist. Ct. App. 1982) (allowing quantum meruit recovery where broker "produced a loan offer from a reputable bank for the defendant . . . on terms which [the defendant] stated it wanted").

## ORDER

The parties will submit proposed forms of judgment within fourteen (14) days of the entry of this opinion for the court's consideration.

SO ORDERED.

/s/ Richard G. Stearns
UNITED STATES DISTRICT JUDGE